IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,          :

     Plaintiff,

     v.          :          Case No. 3:12-cr-133

DAVID KREITZER          :          JUDGE WALTER H. RICE

     Defendant.

                    :

---

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO
SUPPRESS AND MOTION IN LIMINE (DOC. #10)

---

Defendant David Kreitzer ("Kreitzer," "Defendant") has been charged with

four counts of receiving and possessing child pornography under various

subsections of 18 U.S.C. § 2252. Pending before the Court is Defendant's Motion

to Suppress and Motion in Limine. Doc. #10. Defendant seeks to suppress the

evidence of child pornography obtained from the search of his home and the

statements he made to law enforcement officers after the search. The Court held

an oral and evidentiary hearing on March 5, 2013, and post-hearing briefs were

filed by the Government (Doc. #20) and the Defendant (Doc. #18). The Court's

subject matter jurisdiction arises under 18 U.S.C. § 3231. For the reasons set

forth below, the Court OVERRULES the Defendant's Motion to Suppress and

Motion in Limine.

## I. FACTUAL BACKGROUND

On May 3, 2011, United States Magistrate Judge Sharon L. Ovington authorized a warrant to search the residence located at 1827 Miami Ave., Fairborn, Ohio. Doc. #11-1. The warrant authorized the seizure of computer hardware, software, documents, and other tangible things, based on a probable cause determination that evidence related to offenses for possessing or receiving child pornography would be found at the residence. *Id*.; *see* 18 U.S.C. § 2256(8). Jason G. Kearns, Special Agent for Homeland Security Investigations ("HSI"), submitted the affidavit in support of the warrant. In the affidavit, Agent Kearns provided a background of the use of the internet and computers in child pornography offenses. Doc. #11-1. Kearns's affidavit also detailed the facts of the investigation that pertained to Defendant and Defendant's residence, and provided an explanation of common characteristics shared by collectors of child pornography based on Kearns's own investigative experience. *Id*.

The affidavit provided the following facts specific to the investigation that led to the search of Defendant's residence. On March 19, 2010, Italian law enforcement officials notified the HSI Cyber Crimes Center that they had identified a website, located at www.liberalmorality.com, that was "offering access to child pornographic images and/or video files." *Id.* at 12. The same day, an HSI agent accessed the liberalmorality.com website. The site's homepage contained the following text: "Liberal Morality," "Hot Girls," "PornStars," "Celebrity," "Facebook," and "Suggestions." *Id.* Of the foregoing text, only the "Hot Girls,"

"PornStars," and "Suggestions" text contained links that led to other active pages on the site. *Id.* Both the "Hot Girls" and "PornStars" links led to pages where users could view and download child pornography, and also upload images and videos. *Id*. at 13-15. The "PornStars" page displayed twelve images, the majority of which "depicted children involved in sexually explicit conduct." *Id.* at 15. After obtaining the Internet protocol ("IP") address[1] of the website and identifying the website's owner, the HSI investigation was able to obtain a search warrant for an address in Chesterbrook, Pennsylvania. *Id.*

The search uncovered the entire contents of the liberalmorality.com website, as well as the site's web access logs. *Id.* at 16. The web access logs recorded all of the activity of users of the site, including file uploads and downloads, as well as the IP addresses from where requests originated. *Id.* According to the affidavit, images on the site were initially displayed in thumbnail size, but users could obtain an enlarged image by clicking on the thumbnail. *Id.* Once a user clicked on a thumbnail, the web access log recorded the request as a "get" command, and made a record of the particular file requested. *Id.*

The liberalmorality.com web access log recorded a "get" command from the IP address 75.186.131.88 on March 19, 2010, for an image with the filename 1268977707548.jpg on the "PornStars" page. *Id.* at 16. The file retrieved by the

---

[1] An Internet protocol address is "[t]he 10-digit identification tag used by computers to locate specific websites." Black's Law Dictionary (9th ed. 2009).

"get" command contained an image of a naked, prepubescent female whose genitals were exposed. *Id.* at 17.

Based on the information contained in the weblog, an administrative subpoena issued to Time Warner on August 6, 2010, sought information about the IP address 75.186.131.88. The subpoena revealed that the address was assigned to David Kreitzer on or about March 19, 2010, the billing address for the account was 1827 Miami Ave., Fairborn, Ohio, and the Internet service began on January 15, 2008. *Id.* at 18. Inquiries to state authorities and the United States Postal Service yielded more information that associated Kreitzer with the Miami Ave. address. *Id.* at 18, 20. Surveillance conducted outside the Miami Ave. residence resulted in observation of a blue 1989 Ford Crown Victoria that was registered to David Kreitzer at the aforementioned address. *Id.* at 19.

The affidavit also contained information about an investigation conducted by the FBI in 2001 of a Yahoo! e-group devoted to the exchange of child pornography, called "TheCandyman." *Id.* at 18. Over approximately a one month period in early 2001, the FBI captured all the internet activity that occurred within The Candyman e-group, including 489 emails that contained over a hundred child pornography images. *Id.* at 19. The investigation identified two other Yahoo e-groups that "facilitated the trafficking of child pornography," identified in the affidavit as "http://www.egroups.com/group/girls12-16" and "http://www.egroups.com/group/shangri-la." *Id.* An email address registered to David Kreitzer, goofball72@juno.com, was a member of all three of the Yahoo! e-

4

groups. *Id.* No search warrant was ever obtained for Kreitzer's residence at the time, which was also located in Fairborn, Ohio. *Id.* The FBI gave the information to the Xenia, Ohio, police department, but the case was closed and no charges were filed. *Id.*

Based on the foregoing information, Agent Kearns obtained a search warrant for the residence at 1827 Miami Ave., in Fairborn, Ohio. Doc. #11-1. On May 5, 2011, Agent Kearns, accompanied by fellow law enforcement officers, executed the search warrant. The officers collected computers and electronic storage media. Doc. #14 at 10. In addition, they seized printed pictures of child pornography that were found on the floor. *Id.* at 42. Defendant was not home at the time of the search, so the officers left a copy of the warrant taped to the wall, along with a list of the items that they had seized. *Id.* at 10. Agent Kearns also left a business card that listed his name and contact information. *Id.* at 10-11.

**A.     Defendant's Post-Search Conversations with Law Enforcement**

The same day that the search occurred, Defendant attempted to call Agent Kearns and left three voicemail messages for him. *Id.* at 11-12. Agent Kearns called the Defendant back at 4:50 p.m., and spoke to Defendant on a speakerphone in a conference room. Doc. #14 at 13. Special Agent Glenn DeMar

was present during the conversation.[2] *Id*. According to Agent Kearns, Defendant made incriminating statements during that 35 minute phone conversation. *Id.* at 12. Defendant stated that the agents would find child pornography on his computer. *Id.* at 49. Agent Kearns also testified that neither he nor Agent DeMar made any threats or promises to Defendant during the conversation. *Id.* at 13.

Twenty minutes later, Defendant called again and left another voicemail message. *Id.* at 14. Agent Kearns called Defendant back, and Defendant stated that he had forgotten to mention that some of the computer disks seized from his home contained child pornography. *Id.* Agent Kearns testified that neither he nor Agent DeMar made any threats or promises to Defendant during the second phone conversation. *Id.* at 15.

On May 11, 2011, Agent Kearns and the Defendant again spoke by telephone, in order to set up a face to face meeting. *Id.* at 16. The phone conversation was brief, and Defendant made no incriminating statements when they spoke. *Id.* Agent Kearns and the Defendant agreed to meet at the Fairborn Police Station. *Id.* Agent Kearns testified that they chose to meet at the Fairborn Police Station for two reasons. First, the agents had seen weapons during their search of Defendant's home, and Agent Kearns felt that the police station would be "more of a controlled environment where we didn't have to worry about our

---

[2] On the date of the evidentiary hearing, Agent DeMar was on assignment in Afghanistan and unable to testify. Doc. #14 at 13.

safety." Doc. #14 at 50. Second, the police station was close to where Defendant lived, and meeting there would be more convenient for him than meeting the agents in Dayton, or at their office in Cincinnati. *Id.* at 50-51. Defendant did not protest meeting at the police station, nor did he ask to meet at another location. *Id.* at 16-17.

On May 13, 2011, Defendant met Agent Kearns and Agent DeMar at the Fairborn Police Station. *Id.* at 17. Defendant arrived alone, of his own accord, and was not escorted by a police officer. *Id.* Before speaking to Defendant, Agent Kearns advised Defendant of his rights by reading from a form that HSI typically used for that purpose. *Id.* at 18-19. The statement read to Defendant stated that Defendant had the right to remain silent; that any statements he made could be used against him in court; that Defendant had the right to consult an attorney, the right to have one present during questioning, and the right to have one appointed if he couldn't afford one. *Id.* at 19-20. Defendant was also told that he could stop the questioning at any time in order to consult an attorney. *Id.* at 20. Defendant did not sign a written waiver. *Id*. at 44. According to Agent Kearns, Defendant indicated that he understood his rights and had no questions. *Id.* at 20.

During the interview, Defendant did not ask the agents to stop the questioning, nor did he ask to consult with an attorney. *Id.* Defendant did not ask to leave. *Id.* Defendant was not restrained or handcuffed. *Id.* at 21. The questioning took place in an eight-by-five foot room containing a table and chairs. *Id.* The door to the room was open during the interview. *Id.* Although both

agents were wearing weapons, the weapons were holstered and not visible to Defendant during the interview. *Id.*

Agent Kearns testified that no promises of leniency were made to Defendant, nor was Defendant told that he would not be arrested or charged if he cooperated with the agents. *Id.* at 22. Agent Kearns did not recall stating that those who put the child pornography on the Internet were the focus of the investigation and not Defendant, but testified that it was possible that he had made such a statement. *Id.* at 45. Defendant was not promised that cooperation would result in reduced charges, nor was he threatened. *Id.* at 22. Defendant was not arrested or placed in custody at the time of the interview. *Id.*

The interview lasted fifty minutes. *Id.* at 23. Before leaving, Defendant told the agents that they should call him if they had any more questions. *Id.* Some time after the interview, Defendants and the agents spoke once again in order to return some of the items seized from Defendant's house. *Id.*

## B.     Indictment and Procedural Background

On October 23, 2012, a grand jury returned a four-count indictment against Defendant. Doc. #3. Defendant was charged with three counts of receipt of child pornography under 18 U.S.C. § 2252(a)(2) and 2252(b)(1), and one count of possession of child pornography under 18 U.S.C. § 2252(a)(4) and 2252(b)(2). *Id.* Defendant filed a Motion to Suppress and Motion in Limine on December 10, 2012. Doc. #10. Therein, Defendant argued that insufficient probable cause

8

existed to justify the warrant that authorized the search of his home, and that statements he made were involuntary, coerced, and made subsequent to an illegal search. Doc. #10. The Government filed a Response to Defendant's Motion to Suppress and Motion in Limine on December 21, 2012. Doc. #11. The Court conducted an oral and evidentiary hearing on Defendant's Motion to Suppress on March 5, 2013.[3] At the Court's request, the parties provided supplemental briefing on the issues. Defendant filed a Supplemental Memorandum in Support of the Motion to Suppress on April 29, 2013. Doc. #18. The Government filed a Supplemental Memorandum Opposing Defendant's Motion to Suppress on May 6, 2013. Doc. #20.

## II.   ANALYSIS

As a means of analysis, the Court will first address Defendant's argument that insufficient probable cause existed to support the warrant that authorized a search of his home, requiring the suppression of the evidence obtained as fruits of the poisonous tree. The Court will then turn to Defendant's argument that his statements were unconstitutionally coerced from him and, as a result, should be suppressed.

---

[3] The hearing was originally scheduled for January 17, 2013, but the Court sustained a Motion to Continue that Defendant had filed on January 15, 2013. Doc. #12.

## A. The Probable Cause Determination

The Fourth Amendment protects each person's constitutional right to be free from unreasonable searches or seizures, providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  A law enforcement officer's sworn affidavit supplies the required oath or affirmation, and the affidavit must contain "a substantial basis" for the reviewing magistrate to conclude that probable cause justifies the search. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).  Probable cause is a "practical, nontechnical conception" of probabilities in an everyday, nonmathematical sense. *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).  Thus, the notion of "probable cause is a fluid concept- turning on the assessment of probabilities in particular factual contexts-- not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.  Although probable cause resists precise definition, it may be described as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citing *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1135 (6th Cir. 1989)).

The reviewing magistrate must employ a "totality-of-the-circumstances analysis" to determine whether probable cause exists to issue the warrant. *Gates*, 462 U.S. at 238.  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in

10

the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* Furthermore, the reviewing court must only assure itself that a substantial basis supported the magistrate's initial conclusion. *Id.* at 238-39. The magistrate's conclusion must be "afforded great deference and should only be reversed if arbitrarily made." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)).

When reviewing the magistrate's probable cause determination, a court must limit its focus to the information presented within the four corners of the warrant's affidavit. *Id.* (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). The nature of the totality of the circumstances analysis precludes "engaging in line-by-line scrutiny" or a "hypertechnical" reading of the supporting affidavit. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). Instead, a "flexible, common-sense standard" is favored. *Gates*, 462 U.S. 213, 239 (1983). Nevertheless, because the magistrate's decision should be neutral and detached, and not merely a rubber stamp for law enforcement, deference to the magistrate's conclusion is not unlimited. *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (internal citations omitted).

With the foregoing standard in mind, the Court will address Defendant's two challenges to the probable cause determination. The Court will first address Defendant's argument that the information in the affidavit was stale, and then turn to his argument that, even if not stale, the information was insufficient to support

11

the magistrate's ultimate conclusion regarding the presence or absence of probable cause.

### 1. The evidence contained in the affidavit supporting the warrant was not "stale."

An affidavit supporting a search warrant must, generally, contain "facts so closely related to the time of the issu[ance] of the warrant as to justify a finding of probable cause at that time." *Sgro v. U.S.*, 287 U.S. 206, 210 (1932). The temporal requirement exists because "probable cause to search 'is concerned with facts relating to a presently existing condition,'" namely, the presence of evidence of a crime, in a particular place, at the time the warrant is issued. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quoting Wayne R. LaFave, 2 *Search and Seizure* § 3.7(a) at 338 (3d ed. 1996)). Whether the facts demonstrate a sufficient temporal connection to the time the warrant is issued "must be determined by the circumstances of each case." *Sgro*, 287 U.S. at 210-11. Furthermore, "the length of time between the events listed in the affidavit and the application for the warrant, while clearly salient, is not controlling." *Spikes*, 158 F.3d at 923. These temporal considerations matter because "stale information cannot be used in a probable cause determination." *United States v. Frechette*, 583 F.3d 374, 377-78 (6th Cir. 2009) (citing *Spikes*, 158 F.3d at 923).

The staleness test does not exist "to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." *Id.* (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). Instead, it

flexibly examines four "relevant variables" in connection with the information presented in the affidavit supporting the warrant:

1) the character of the crime (chance encounter in the night or regenerating conspiracy?)
2) the criminal (nomadic or entrenched?)
3) the thing to be seized (perishable and easily transferable or of enduring utility to its holder?)
4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (quoting *Spikes*, 158 F.3d at 923).

Because of the unique characteristics of the offense, the Sixth Circuit has observed that "the same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009). Drugs, for example, "are usually sold and consumed in a prompt fashion," but child pornography "images can have an infinite life span." *Frechette*, 583 F.3d at 378. Furthermore, child pornography offenses are "generally carried out in the secrecy of the home and over a long period" of time. *Paull*, 551 F.3d at 522. Thus, in *Paull*, in which the affidavit alleged that the defendant had subscribed to and downloaded images from multiple websites over a period of two years, the Sixth Circuit rejected the argument that the evidence was stale because 13 months had elapsed between the defendant's last purchase and the issuance of the warrant. *Id.* at 523. The Sixth Circuit has consistently rejected staleness challenges to evidence obtained many months before the issuance of a warrant based on probable cause of evidence of child

13

pornography. *See Frechette*, 583 F.3d at 377-79 (reversing suppression of evidence that defendant purchased subscription to child pornography website sixteen months before execution of warrant); *United States v. Hampton*, 504 Fed. App'x 402 (6th Cir. 2012) (affirming denial of a motion to suppress evidence where affidavit stated that defendant had offered an image of child pornography on a file-sharing network ten months before warrant's approval); *United States v. Gillman*, 432 Fed. App'x 513 (6th Cir. 2011) (affirming denial of a motion to suppress evidence where affidavit stated that defendant had offered video of child pornography on file-sharing network five months before the warrant was issued); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010) (holding that probable cause existed based on affidavit alleging that defendant had sent image to law enforcement agent seven months before warrant application). Even evidence dating years before the warrant's issue may resist a staleness challenge, as other Circuit Courts of Appeal have recognized. *See, e.g.*, *United States v. Irving*, 452 F.3d 110, 116, 125 (2nd Cir. 2006) (rejecting staleness challenge to search warrant based on evidence that included a letter dated nearly two years before); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (affirming denial of motion to suppress based on three-year old evidence). Thus, the character of a child pornography crime does not render the Government's evidence vulnerable to Defendant's staleness challenge, based only on the 13 months that passed after the record of activity in the liberalmorality.com weblog and the magistrate's approval of the warrant to search Defendant's home.

14

The second variable in the staleness inquiry asks whether the defendant is "nomadic or entrenched?" *United States v. Hython*, 443 F.3d at 485. The facts as alleged in the affidavit do not suggest that Defendant was transient, and in fact suggest that Defendant was established where he lived. The U.S. Postal Service informed the affiant that Defendant received mail at the address where the warrant was executed, an active internet account in Defendant's name was active at that address, and surveillance observed an automobile registered to him at that address. The affidavit also describes a previous address from several years ago, also in Fairborn, Ohio, where the defendant previously resided. Thus, Kreitzer's entrenchment at the address where the warrant was executed also diminishes the possibility that the evidence described was stale.

The third variable examines the nature of the thing to be seized. *Hython*, 443 F.3d at 485. Child pornography has "enduring utility to its holder." *Id.* Although a user could possibly delete such material, child pornography is not "perishable" in in the sense that its age might render it stale as evidence of probable cause. *Id.* In contrast to "narcotics that are bought, sold, or used, digital images of child pornography can be easily duplicated and kept indefinitely even if they are sold or traded. In short, images of child pornography can have an infinite life span." *Frechette*, 583 F.3d at 379 (citing *United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008)). Here, too, the affidavit stresses the non-perishable nature of the material, which may exist in files that "can be stored for years at little to no cost," and, even if deleted, "may be recoverable months or years later

15

using readily-available forensic tools." Doc. #11-1 ¶ 30. The affidavit also describes the lasting value that such images have for collectors of child pornography, demonstrating its enduring utility to such individuals. Doc. #11-1 ¶ 49e (stating that such collections are "often maintained for several years and are kept close by" because they are "valued highly" by the collector). These characteristics also argue against a conclusion that the evidence cited by Agent Kearns was stale.

Finally, the fourth variable examines the place to be searched. *Hython*, 443 F.3d at 485. Here, the place to be searched was the defendant's home. For a possessor of child pornography, the home is much more of a "secure operational base" than a merely convenient forum. *Id.* In addition, the affidavit identifies the child pornography collector's home as the place where such collections are usually kept, both because of the "value" to the collector and because such individuals "prefer not to be without their child pornography for any prolonged time period." Doc. #11-1 ¶¶ 49e-49f. Thus, the fact that the warrant authorized a search of Defendant's home, the type of place where such evidence is preserved for long periods, also argues against a finding of staleness.

In short, none of the aforementioned factors supports a finding that the evidence relied upon in the affidavit was stale. Defendant merely points to the length of time between the Government's discovery of the evidence relied upon and the execution of the warrant, as if some bright-line date had expired, thereby rendering the evidence described in the affidavit unusable. Doc. #10 at 6; Doc.

#18 at 9. Moreover, the unique nature of the crime alleged and the material involved make the lapse of time of which the defendant complains of very little consequence. Defendant's staleness argument is, therefore, not well taken.

Defendant also challenges as stale the affidavit's mention of the investigation from 2001, based on his alleged participation in "TheCandyman" and other Yahoo! e-groups associated with the exchange of child pornography. The Court believes that the ten years that elapsed between the conclusion of that investigation and the approval of the search warrant presents a stronger argument for staleness. However, the information regarding that investigation that pertains to Defendant, which states only that he was a member of the e-group in question, is of so little consequence that its inclusion in the affidavit contributes nothing of substance to the probable cause calculation. (As explained in Section II.A.2 below, Defendant's activities at the liberalmorality.com website alone justified the initial probable cause determination.) As Defendant points out, no charges were ever filed against him based on any information discovered during the course of the Yahoo! e-group investigation. The affidavit contains no allegation that Defendant received or possessed any of the images that other group members emailed to each other.[4] Even if one assumes that the information regarding Defendant's

_____

[4] It is unlikely that the affidavit could have made any such allegation. Sworn statements made by the FBI agent in the original 2001, "TheCandyman" e-group investigation, asserting that group members automatically received its emails and attached images, were later determined to be false. *See United States v. Shields*,

alleged participation in the e-groups was stale, and that any mention of it should, therefore, be removed from the affidavit, the facts that remain are sufficient to establish probable cause. Because the affidavit's mention of the Defendant's membership in those e-groups provides no weight to the probable cause determination, whether or not that particular information was stale is irrelevant. Both of Defendant's staleness arguments, are, therefore, without merit.

### 2. *The information contained in the affidavit was sufficient to support the Magistrate's probable cause determination.*

Defendant also challenges the sufficiency of the affidavit that supported the search warrant. Specifically, Defendant argues that there was no evidence that he knew that the website contained images of child pornography, nor was there evidence that he actually downloaded any such images from the website. Doc. #10 at 6. The Court finds each of Defendant's arguments without merit.

Defendant is correct that knowledge is the required *mens rea* element of the offenses for which the Government sought evidence at Defendant's residence.

---

458 F.3d 269, 274-76 (3rd Cir. 2006) (upholding probable cause determination even after purging false information from affidavit). The Third Circuit noted that the agent's "misrepresentations have spawned a veritable cottage industry of *Franks* challenges by Candyman defendants across the country." *Id.* at 276. As stated above, the affidavit states only that Defendant was a member of the e-groups. The affidavit contains no statement vulnerable to a *Franks* challenge under the misrepresentations described in *Shields*, nor has Defendant made any such assertion. Furthermore, as noted above, even after removing the allegedly stale information from the warrant, the remaining information would establish the probable cause necessary to justify the search of Defendant's home.

*See* 18 U.S.C. § 2252(a)(2) (violator is one who "knowingly receives") and 18 U.S.C. § 2252(a)(4) (violator is one who "knowingly possesses").  In addition to showing that a defendant knowingly *received* or knowingly *possessed* images containing child pornography, the defendant must also have known "the sexually explicit nature of the material and the age of the performers."  *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994).  However, the offense does not require that the Defendant knowingly *visited* a site containing child pornography. Thus, the affidavit's failure to allege what Defendant knew about the site before visiting it is not material to what he knew at the time he allegedly received or possessed the images in question.  The latter knowledge is the knowledge that is material to the offenses with which Defendant is charged.

Furthermore, based on the contents of the affidavit, there was a fair probability that someone at Defendant's residence knowingly received or possessed material with the knowledge that it was both sexually explicit and featured minors.  The affidavit states that "[t]he thumbnail images, as displayed, were of sufficient size for a user to identify the nature and content of the images." Doc. #11-1 at 17.  Thus, before clicking on a thumbnail to enlarge or download the image, a user would be aware of the file's contents.  The affidavit also describes the image that Defendant "accessed and received or attempted to receive" as a digital photo of a completely nude "prepubescent female" with her genitals exposed.  *Id.*  The thumbnail gave fair warning of the contents of any image a user might enlarge.  It did not, for example, present an innocuous image of

a sunset that an unsuspecting user might click on, only to be confronted with a pornographic image containing a child.  Based on the connection of the foregoing activity to Defendant's home and internet account, there was a fair probability that he knowingly received or possessed the image in question, which adequately supports the magistrate's finding of probable cause.

Defendant's argument that the affidavit was insufficient to demonstrate probable cause, because it lacked evidence that he actually downloaded images from the liberalmorality.com website, is also without merit.  Again, Defendant's argument invents a fictional requirement for the violation.  Intentional downloading of child pornography images is not a required element of a Section 2252 or Section 2252A offense.  In *United States v. Tucker*, 305 F.3d 1193, 1205 (10th Cir. 2002), the Tenth Circuit Court of Appeals upheld the sufficiency of a defendant's conviction, which was based on the viewing of images of child pornography that were not downloaded, but merely saved in the cache file of the defendant's web browser.  *See also United States v. Hall*, 202 F.3d 270, 2000 WL 32010 (6th Cir. 2000) (upholding the sufficiency of the evidence used to convict a defendant for possession of child pornography based on images found not only in "the active area of the hard drive, where files are saved on the computer" but also "in the cache, or temporary storage area, where downloaded images from the Internet are temporarily saved," as well as "the erase file, or inactive portion of the hard drive"); *United States v. Terry*, 522 F.3d 645, 649 (6th Cir. 2008) (discussing Circuit Courts of Appeals' opinions upholding warrants based on access to sites

20

"contain[ing] both legal and illegal material, and in which the government's affidavit supporting a search warrant never stated whether the individuals had actually downloaded any of the illicit materials"). Here, the affidavit states that "the IP address assigned to David Kreitzer at the relevant time revealed that the user accessed the website and obtained numerous visual depictions of minors engaged in sexually explicit conduct including one enlarged (full size) image of child pornography." Doc. #11-1 at 17. Based on the foregoing information in the affidavit alone, there is no support for Defendant's contention that, within the four corners of the affidavit and search warrant, "there is no probable cause that a crime had been committed or that criminal activity probably occurred." Doc. #10 at 7. Rather, the affidavit describes Defendant's access to a website that contained thumbnail images of child pornography, one of which Defendant obtained by enlarging it. The Court concludes that the Government's affidavit contains a more than adequate foundation for upholding the magistrate's determination that probable cause existed to support the issuance of the search warrant for Defendant's residence. Accordingly, Defendant's motion to suppress the evidence based on a lack of probable cause is overruled.

## B. The *United States v. Leon* "Good Faith Exception"

The Government argues that, even if insufficient probable cause supported the warrant, the evidence would not be subject to suppression because of the

"good faith" exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897 (1984). Doc. #11 at 9. The Court agrees.

In *Leon*, the Supreme Court described a "balancing approach" that allows the introduction of evidence obtained when law enforcement acts with a reasonable, good faith belief that the search producing it complied with the requirements of the Fourth Amendment. 468 U.S. 897 at 909. Even if a warrant is ultimately determined to be invalid based on a lack of probable cause, "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. The good faith exception recognized in *Leon* does not apply in the following four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480 (6th Cir. 2006) (citing *Leon*, 468 U.S. at 923).

Since deciding *Leon*, the Supreme Court has reaffirmed that there is no automatic application of the exclusionary rule, the application of which is not "a

necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *Leon*, 468 U.S. at 905-06). Rather, "appreciable deterrence" must result from its application, and "the benefits of deterrence must outweigh the costs." *Id.* (citing *Leon*, 468 U.S. at 909, 910). Furthermore, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143. Only when an "officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment" should evidence be excluded. *Id.* at 143 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

Here, there is no contention that false statements supported the affidavit, or that the magistrate "wholly abandoned" her neutral role and merely rubber stamped the warrant for law enforcement. *Leon*, 468 U.S. at 923. The affidavit in support of the warrant was not of the "bare bones" type. In its twenty-six pages, it detailed the steps that led law enforcement to the liberalmorality.com website and its web access logs, the identification of Defendant's IP address in those logs and the image accessed by a computer at that IP address, and the association of the IP address with Defendant's internet account, which Defendant subscribed to at his residence. The executing officers' reliance on its contents was objectively reasonable. Furthermore, there are no allegations of misconduct that would be susceptible to correction or deterrence by application of the exclusionary rule. Thus, the Court concludes that the good-faith exception would apply even if

a lack of probable cause had undermined the validity of the warrant, and the evidence obtained from the search of Defendant's home would not be subject to suppression.

### C. The Non-Coercive Circumstances Surrounding Defendant's Statements

Defendant claims that he was coerced by Agent Kearns into making involuntary statements, in violation of his Due Process rights, and his statements should, therefore, be suppressed.  Doc. #18 at 13-14.  When a defendant claims that his statements to law enforcement were procured by coercion, the government must demonstrate, by a preponderance of the evidence, that the statements were freely given and voluntary.  *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).  In the Sixth Circuit, there are three requirements necessary for a finding that a defendant's will was overborne, resulting in a coerced confession: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  *Mahan*, 190 F.3d at 422.

Defendant's argument fails at the first *Mahan* requirement, because there was nothing objectively coercive about Agent Kearns's activities during the phone conversations or the in-person interview.  A court must examine the totality of the circumstances to determine the voluntariness of the defendant's statements.

24

*Johnson*, 351 F.3d at 260 (quoting *Mahan*, 190 F.3d at 422). A variety of factors are relevant to the determination, including "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Mahan*, 190 F.3d at 422-23. First, it was Defendant who initiated both phone conversations with Agent Kearns on the afternoon of May 5, 2011. Defendant was not even at the same physical location as the agents, and the conversations were relatively brief. Defendant points to nothing about his age, education, or level of intelligence that would render those conversations coercive.

The Court also finds nothing coercive about the circumstances of the Defendant's in-person interview at the Fairborn Police Station. The inherently coercive nature of custodial interrogation remedied by *Miranda* warnings is simply not implicated by the circumstances of Defendant's interview. *Miranda v. Arizona*, 384 U.S. 436, 458 (1966). Defendant arrived and left alone, and did so of his own accord. He was questioned for less than an hour, and the door to the room was open the entire time. The agents' weapons were not visible to Defendant during the interview. Most importantly, Agent Kearns fully informed Defendant of his *Miranda* rights before the interview began. Defendant chose to continue the interview after indicating that he understood his rights. Upon leaving, he told the agents to call him if they had any further questions. The Court fails to recognize any indicia of coercion in the circumstances of the interview.

Defendant's only argument to support his assertion that his statements were coerced is based on the "possibility" that, during either the phone conversation or the in-person interview, Agent Kearns told Defendant that HSI "wasn't necessarily after the Defendant, but [was] more interested in the people that were putting the child pornography on the internet to begin with. Defendant considers this statement coercive." Doc. #18 at 13. The Court does not. A promise of leniency may be objectively coercive, thereby leading to a finding that a statement was involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2006). However, only "broken or illusory" promises could be considered coercive. *Id.* at 262 (finding non-coercive a police promise not to prosecute a defendant's sister if the defendant turned himself in where probable cause existed to arrest the sister and police did not prosecute her). "[W]hen promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect, we are obliged to inquire whether the coercion in question was sufficient to overbear the will of the accused." *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir.1991), *rev'd on other grounds by* 507 U.S. 680 (1993).

First, the Court is not convinced that Agent Kearns made the statement to which Defendant refers. During his testimony, Agent Kearns did not recall making any such statement, conceding only that it was possible. Doc. #14 at 45. Second, even if Agent Kearns had made such a statement, it contained no promise to Defendant, much less one that was broken or illusory. The agent did not promise not to pursue charges against Defendant, nor does Defendant assert that

26

any such promise was made. Finally, it is simply a matter of common sense and effective law enforcement technique that HSI and its investigators would be "more interested" in the creators and disseminators of child pornography than the consumers of such material. Defendant's characterization of a statement as "coercive," that was only possibly uttered, and, if uttered, lacked any discernible expression of an actual promise or threat, is entirely without merit.

Based on the totality of the circumstances surrounding Defendant's phone conversations and the in-person interview with the HSI agents, the Government has fulfilled its burden to show, by a preponderance of the evidence, that Defendant's statements were freely and voluntarily made. There were no indicia of coercion, Defendant was not in custody, and Defendant spoke freely after being apprised of his constitutional rights. Accordingly, the Court will not suppress any of the statements he made during phone conversations with Agent Kearns and Agent DeMar on May 5, 2011 or May 11, 2011, or the May 13, 2011, in-person interview with the aforementioned agents.

## III.    CONCLUSION

For the reasons set forth above, the Court concludes that probable cause existed to justify the search warrant that authorized the search of Defendant's home. Furthermore, Defendant made all statements to Agent Kearns and Agent DeMar freely, with no indicia of custody or coercion. The Court will not suppress the evidence uncovered from the search or Defendant's statements, and,

27

therefore, OVERRULES Defendant's Motion to Suppress and Motion in Limine

(Doc. #10).


Date:  July 10, 2013

WALTER H. RICE
UNITED STATES DISTRICT JUDGE